IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JARVIS PARKER,<br><br>    *Plaintiff*,<br><br>  v.<br><br>CENLAR FSB, a subsidiary of Cenlar Capital Corporation,<br>    *Defendant*. | CIVIL ACTION<br>NO. 20-02175 |

**PAPPERT, J.**                              January 4, 2021

## **MEMORANDUM**

  Jarvis Parker sued Cenlar FSB alleging violations of Title VII of the Civil Rights Act of 1964, the Pennsylvania Human Relations Act, 42 U.S.C. § 1981 and the Americans with Disabilities Act. He has amended his complaint twice and Cenlar now moves to dismiss the Second Amended Complaint. The Court denies in part and grants in part Cenlar's Motion for the reasons that follow.

I

  In October of 2019, Parker sought temporary employment through firstPRO, Inc., an employment agency in Philadelphia. (Sec. Am. Compl. ¶ 8, ECF No. 25.) FirstPro placed Parker with Cenlar, a savings and loan holding company, where he worked as a Technical Project Manager from October until March of 2020. (*Id.* at ¶¶ 5, 9). Parker did not have an employment contract with Cenlar. Instead, firstPRO and Cenlar contracted with one another. (*Id.* at ¶ 11.) Pursuant to that agreement, Cenlar paid firstPRO $75 for each hour Parker worked. (*Id.* at ¶ 10.) Presumably, firstPRO would then pay Parker all or some of that total. Despite this indirect payment

1

structure, Parker alleges that he did not accept work assignments from firstPRO and worked only at Cenlar's offices performing work in Cenlar's normal course of business. (*Id.* at ¶ 10.)  Cenlar provided him materials necessary to perform his job functions, controlled when and for how long he worked and "directed [his] daily employment activities." (*Id.*)  Cenlar's employees supervised Parker, provided any necessary training and verified his hours worked. (*Id.*)

Parker claims that as one of eight Technical Project Managers at Cenlar, his job performance was "outstanding." (*Id.* at ¶ 12.)  In fact, Parker was so well-regarded at Cenlar that his direct supervisor, Henry Lieb, discussed full-time employment with him in late January of 2020. (*Id.* at ¶ 16.)  Lieb and Parker discussed a six-figure salary, job duties and where Parker might work if hired full-time. (*Id.*)  Parker told Lieb that he enjoyed working at Cenlar and would accept a full-time position if offered. (*Id.*)  Then Parker informed a firstPRO employee that Cenlar intended to hire him. (*Id.*)

This positive development notwithstanding, Parker, who is African-American, was allegedly the target of racial discrimination by Cenlar's Vice President of Technology, Michael Rainer. (*Id.* at ¶ 26.)  In November, January and February, Parker lodged verbal complaints with Lieb about Rainer's conduct. (*Id.*)  Lieb took no action in response. (*Id.*)  In early February, shortly after Parker discussed full-time employment with Lieb, Parker verbally complained to both Lieb and Lieb's supervisor, Margaret Boutcher, about Rainer's conduct. (*Id.*)  Lieb and Boutcher did not investigate the complaint or follow any normal company procedures. (*Id.*)  Instead, they "blamed" Parker for the situation with Rainer and began treating him "differently and worse" than before he complained. (*Id.*)

On March 10, Parker learned that a professor at the Rutgers University Business School, where he was a student, tested positive for COVID-19. (*Id.* at ¶¶ 18–19.) Two days later, he emailed Lieb and Boutcher to share this news, but claims he told them that he did not attend in-person classes at the school. (*Id.* at ¶ 20.) When Parker reported for work the next day, Lieb told him he should work remotely, seemingly because of the possibility that he was exposed to COVID-19. (*Id.* at ¶ 21.) But as Parker was leaving, Lieb asked him to return his laptop, preventing him from working remotely. (*Id.*)

On March 17, Cenlar terminated Parker, citing a lack of work. (*Id.* at ¶ 23.) Contrary to that position, however, Parker was working on two projects at the time, and Cenlar hired a non-African-American Technical Project Manager a few weeks later and continued to advertise for open Technical Project Manager positions in May and June. (*Id.* at ¶ 25.) When Cenlar terminated Parker, he was the longest-tenured and only African-American Technical Project Manager. (*Id.* at ¶¶ 13–14.) Cenlar did not terminate any other Technical Project Managers at the time it fired Parker. (*Id.* at ¶ 25.)

Parker claims Cenlar violated Title VII and the PHRA when it terminated him based on his race and in retaliation for complaining of racial discrimination (Counts I and II). (*Id.* at ¶ 34.) Parker also contends Cenlar violated § 1981 by abandoning its intention to hire him as a full-time employee after he complained of racial discrimination (Count III). (*Id.* at ¶¶ 44–45.) In the alternative, he argues Cenlar violated § 1981 by discriminating against him as an independent contractor or that he was an intended third-party beneficiary of the contract between firstPRO and Cenlar,

which prohibited racial discrimination and retaliation. (*Id.* at ¶¶ 47–48.) Next, Parker claims Cenlar violated the ADA and PHRA by terminating him based on a perceived disability—exposure to COVID-19 (Counts IV and V). (*Id.* at ¶ 54.) Finally, Parker advances a claim for intentional infliction of emotion distress, claiming Cenlar's "extreme and outrageous conduct intentionally or recklessly caused [him] severe emotional distress" (Count VI). (*Id.* at ¶ 68.)

Cenlar moves to dismiss all claims, arguing Parker failed to exhaust his remedies under the PHRA and that he fails to state a claim for relief on any of the claims. (Mot. to Dism. Sec. Am. Compl. 3–4, ECF No. 26-1.)

II

To survive dismissal under Rule 12(b)(6) of the Federal Rules of Civil Procedure, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when the facts pled "allow[ ] the court to draw the reasonable inference that [a] defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

When the complaint includes well-pleaded factual allegations, the Court "should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (quoting *Iqbal*, 556 U.S. at 679). However, this "presumption of truth attaches only to

those allegations for which there is sufficient factual matter to render them plausible on their face." *Schuchardt v. President of the U.S.*, 839 F.3d 336, 347 (3d Cir. 2016) (internal quotation and citation omitted). "Conclusory assertions of fact and legal conclusions are not entitled to the same presumption." *Id.* This plausibility determination is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* (quoting *Connelly*, 809 F.3d at 786–87).

### III

### A

In Counts I and II respectively, Parker alleges that Cenlar violated Title VII and the PHRA by terminating him based on his race and in retaliation for complaining about discrimination.[1]

### 1

Title VII forbids race-based discrimination by employers and other entities. 42 U.S.C. § 2000e–2(a)–(d). Parker alleges that Cenlar was his employer and discriminated against him on the basis of race and retaliated against him. "Accordingly, in order to prevail on his Title VII claim, he must demonstrate the existence of an 'employment relationship'" with Cenlar. *Faush v. Tuesday Morning, Inc.*, 808 F.3d 208, 212 (3d Cir. 2015) (quoting *Covington v. Int'l Ass'n of Approved Basketball Officials*, 710 F.3d 114, 119 (3d Cir. 2013)). To determine whether a plaintiff has established an employment relationship for purposes of Title VII, the Third Circuit applies the test announced in *Nationwide Mut. Ins. Co. v. Darden*, 503

---

[1] Courts assess Title VII and PHRA claims under the same legal standard. *Fasold v. Justice*, 409 F.3d 178, 184 n.8 (3d Cir. 2005); *Ahern v. Eresearch Tech., Inc.*, 183 F. Supp. 3d 663, 668 (E.D. Pa. 2016).

U.S. 318 (1992). *Faush*, 808 F.3d at 213. The non-exhaustive list of factors courts consider under *Darden* includes

> the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

*Darden*, 503 U.S. at 323–24 (quotation marks and citation omitted). No single factor is determinative. Courts must consider "all of the incidents of the relationship." *Id.* at 324 (quotation marks and citation omitted). Parker's allegations in Paragraph 10 of the Second Amended Complaint closely follow this list of factors. Although those allegations appear fairly conclusory, it is plausible that Cenlar, not firstPRO, would control Parker's day-to-day employment activities, set and control his hours, and supervise him. Moreover, like in *Faush*, Cenlar did not pay firstPRO a fixed rate for Parker's services. Instead, Cenlar paid firstPRO "for each hour worked by [Parker] at an agreed-upon hourly rate." *Faush*, 808 F.3d at 215–16. Thus, at this early stage of the litigation, Parker has satisfied his burden of alleging facts that establish an employment relationship with Cenlar.

2

To survive a motion to dismiss on his racial discrimination claim, Parker must also plead sufficient factual matter to permit the reasonable inference that he experienced an adverse employment action because of his race. *See Golod v. Bank of Am. Corp.*, 403 F. App'x 699, 702 (3d Cir. 2010) (citing *Goosby v. Johnson & Johnson Med., Inc.*, 228 F.3d 313, 318–19 (3d Cir. 2000)); *see also Huggins v. Coatesville Area*

*Sch. Dist.*, No. 07-4917, 2008 WL 4072801, at *5 (E.D. Pa. Aug. 27, 2008) ("[A] plaintiff need not plead a *prima facie* case of discrimination in order to survive a motion to dismiss because a *prima facie* case is an evidentiary standard, not a pleading standard."). An inference of discrimination may be developed "in a number of ways, including, but not limited to, comparator evidence, evidence of similar racial discrimination of other employees, or direct evidence from statements or actions by [plaintiff's] supervisor suggesting racial animus." *Golod*, 403 F. App'x at 703 n.2 (citing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511–12 (2002)).

Parker alleges Rainer subjected him to racial discrimination. When he complained to Lieb and Boutcher, they failed to investigate the claims, blamed Parker and began treating Parker worse than before he reported Rainer's conduct. Then Cenlar fired him, citing a lack of work, before hiring a non-African-American replacement the next month. When Cenlar fired Parker, he was the only African-American, and longest tenured, Technical Project Manager. Although these facts more readily support a retaliation claim, at this early stage of the litigation they nudge the discrimination "claim[] across the line from conceivable to plausible," albeit just barely. *Twombly*, 550 U.S. at 570. Cenlar is free, of course, to renew its argument on a fuller record at summary judgment.

3

Title VII also makes it unlawful for an employer to retaliate against an employee for opposing the employer's discriminatory conduct or for bringing or supporting an action arising from the employer's discriminatory conduct. 42 U.S.C. § 2000e–3(a). To state a claim for retaliation under Title VII, Parker must allege that: (1) he engaged in

a protected activity, (2) Cenlar took an adverse action against him and (3) there was a causal connection between the protected activity and the adverse employment action. *Moore v. City of Phila.*, 461 F.3d 331, 340–41 (3d Cir. 2006).

Formal and informal complaints of discrimination constitute protected activity under Title VII. *See Abramson v. William Paterson Coll. of New Jersey,* 260 F.3d 265, 288 (3d Cir. 2001) ("[T]he complaints to [defendant], whether oral or written, formal or informal, are sufficient to satisfy the first prong of the prima facie case, provided the complaints expressed [plaintiff]'s opposition to a protected activity under Title VII."). Parker claims he verbally complained to Lieb three times and that he complained once to both Lieb and Boutcher. If true, these complaints would be protected activity.

Parker undoubtedly suffered an adverse employment action; he was terminated. Thus, the only remaining thing Parker must establish is a causal connection between his complaints and his termination. Parker need not prove but-for causation at this early stage of the litigation to satisfy the final element. *See Carvalho-Grevious v. Delaware State University*, 851 F.3d 249, 258–60 (3d Cir. 2017). Instead, the Court considers whether Parker alleged facts "from which a reasonable factfinder could conclude that [his] engagement in a protected activity was the *likely reason* for the adverse employment action." *Id.* at 261. Although Parker's Second Amended Complaint provides several possible explanations for his termination, he has met his burden at this early stage of the litigation. He claims Lieb and Boutcher blamed him and treated him poorly after he complained of Rainer's misconduct. He also alleges inconsistencies with Cenlar's purported reason for firing him (lack of work) and its conduct thereafter (hiring a replacement). Accepting all of Parker's allegations as true,

he plausibly states a causal connection between his complaints and Cenlar's decision to terminate him.

4

Cenlar argues the Court must dismiss Parker's PHRA claims for another reason: because he failed to exhaust his administrative remedies by dual-filing his EEOC charge with the Pennsylvania Human Relations Commission. Cenlar supports this claim by showing Parker did not check the "FEPA" box on his EEOC charge. (Mot. to Dism. at 2); (Mot. to Dism., Ex. C.) Pennsylvania law requires plaintiffs to exhaust administrative remedies under the PHRA before filing a civil action in court. 43 Pa. Con. Stat. § 962(c)(1); *Woodson v. Scott Paper Co.*, 109 F.3d 913, 925 (3d Cir. 1997). Under the PHRA, when a claimant files a discrimination claim with the PHRC, it has exclusive jurisdiction over the claim for one year; a complainant may not file a lawsuit during that period. 43 Pa. Con. Stat. § 962(c)(1). Unlike the process under Title VII, a notice of the right to sue is not required to bring a PHRA claim; rather, once the one-year period has expired, a complainant may file suit notwithstanding the fact that he has not received a letter from the PHRC. *Burgh v. Borough Council of Borough of Montrose*, 251 F.3d 465, 471 (3d Cir. 2001).

Although Parker did not check the FEPA box, he did clearly indicate his intent to file his charge with both the PHRC and the EEOC by writing in "Pennsylvania Human Relations Commission" on his charge. (Mot. to Dism., Ex. C.) Still, he has not exhausted his administrative remedies under the PHRA. He filed his charge on July 31, 2020. (*Id.*) He filed the Second Amended Complaint on November 2, 2020 and does

not allege that he received a right to sue letter from the PHRC. (ECF No. 25.) Thus, the PHRC retains exclusive jurisdiction over his PHRA claims until July 31, 2021.

Courts in the Third Circuit take a flexible approach to PHRA exhaustion requirements, allowing plaintiffs to maintain PHRA claims if the period of exhaustion expires during the pendency of the litigation. *Eldridge v. Municipality of Norristown*, 828 F. Supp. 2d 746, 758 (E.D. Pa. 2011). District courts may therefore allow plaintiffs to amend their complaints after the mandatory one-year period has elapsed. *See, e.g.*, *Logan v. In-Ter-Space Servs., Inc.*, 2007 WL 2343868 (E.D. Pa. Aug. 15, 2007). Parker's PHRA claims for racial discrimination and retaliation in Count II are dismissed without prejudice to his right to amend his Second Amended Complaint after July 31, 2021.

B

In Count III, Parker alleges Cenlar's decision not to hire him as a full-time employee violated § 1981. Section 1981 "protects the equal right of '[a]ll persons within the jurisdiction of the United States' to 'make and enforce contracts' without respect to race." *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 474–75 (2006) (quoting 42 U.S.C. § 1981(a)). "Section 1981 offers relief when racial discrimination blocks the creation of a contractual relationship . . . so long as the plaintiff . . . would have rights under the . . . proposed contractual relationship." *Id.* at 476.

1

Parker claims racial discrimination motivated Cenlar's decision not to form an employment contract with him. To establish a right to relief under § 1981, Parker must show that (1) he is a member of a racial minority; (2) Cenlar intentionally discriminated

10

against him on the basis of race; and (3) the discrimination concerned his right to make and enforce contracts. *See Pryor v. National Collegiate Athletic Ass'n*, 288 F.3d 548, 569 (3d Cir. 2002); *Brown v. J. Kaz, Inc.*, 581 F.3d 175, 181–82 (3d Cir. 2009) ("[T]he substantive elements of a claim under section 1981 are generally identical to the elements of an employment discrimination claim under Title VII.") Parker's racial discrimination claim under § 1981 survives at this early stage of the litigation for the same reasons his Title VII claim survives; he alleges just enough facts from which the Court can reasonably infer that Cenlar interfered with his right to contract with it because of his race. Parker claims Cenlar initiated discussions about full-time employment then discontinued those discussions and terminated him after he complained to Lieb and Boutcher about racial discrimination. And despite citing a lack of work as the reason for terminating him, Cenlar did not terminate any non-African-Americans or shorter-tenured Technical Project Managers and hired a non-African-American replacement weeks later. Again, although these facts more readily suggest retaliation, they just barely establish that Cenlar interfered with Parker's right to make and enforce an employment contract based on his race.

2

Parker also claims Cenlar denied his right to contract in retaliation for his complaints against Rainer. Section 1981 encompasses retaliation claims. *See CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 446 (2008) (holding that plaintiff could advance retaliation claim under § 1981 after suffering retaliation for complaining about the

violation of another person's rights). Parker states a plausible retaliation claim under § 1981 for the reasons discussed above.[2]

C

In Counts IV and V respectively, Parker alleges Cenlar violated the ADA and the PHRA when it terminated him based on its perception that he may have been exposed to COVID-19. To state a claim for discrimination under the ADA, Parker must show: (1) he is disabled within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by Cenlar; and (3) he suffered an adverse employment decision as a result of the discrimination. *See Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306 (3d Cir. 1999). The ADA defines a disability as: "(A) a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1). Parker argues Cenlar regarded him as being disabled based on his possible exposure to COVID-19. But this claim fails because, notwithstanding whether contracting COVID-19 is a disability under the ADA, possible *exposure* to COVID-19 is not "a physical or mental impairment that substantially limits one or more major life activities." *See* 42 U.S.C. § 12102(2)(A).

D

Count VI alleges a claim for IIED. Cenlar contends that Title VII and § 1981 preempt this claim and that, even if they do not, Parker fails to state a claim. (Mot. to

---

[2] Because Parker argues them only in the alternative, the Court will not address his arguments that Cenlar violated his rights under § 1981 based on his status as an independent contractor and an intended third-party beneficiary of the contract between firstPRO and Cenlar. *See* (Sec. Am. Compl. at ¶¶ 47–48).

Dism. at 23–24.) The Court need not determine whether those anti-discrimination statutes preempt Parker's claim because he has not stated a claim for IIED.

Under Pennsylvania law the elements of an IIED claim are: "(1) the conduct [of the defendant] must be extreme and outrageous; (2) it must be intentional or reckless; (3) it must cause emotional distress; [and] (4) that distress must be severe." *Hoy v. Angelone*, 691 A.2d 476, 482 (Pa. Super. Ct. 1997), *aff'd* 720 A.2d 745. Stating an IIED claim also requires an allegation of some sort of physical injury, harm or illness related to the distress. *Corbett v. Morgenstern*, 934 F. Supp. 680, 684 (E.D. Pa. 1996) (citations omitted). The Court must determine, as an initial matter, if the defendant's conduct is so extreme and outrageous to permit recovery. *Cox v. Keystone Carbon Co.*, 861 F.2d 390, 395 (3d Cir. 1988). Notably, "[i]t is extremely rare to find conduct in the employment context that will rise to the level of outrageousness necessary to provide a basis for recovery for the tort of intentional infliction of emotional distress." *Id.*

Courts applying Pennsylvania law have repeatedly found that allegations of racial discrimination, even when coupled with retaliatory conduct, do not meet the "extreme and outrageous conduct" standard necessary to state a claim of IIED. *See Hargraves v. City of Phila.,* No. 05-cv-4759, 2007 WL 1276937, at *3 (E.D. Pa. Apr. 26, 2007) (collecting cases); *see also Lane v. Cole*, 88 F. Supp. 2d 402, 406 (E.D. Pa. 2000) ("Invidious discrimination is not alone sufficient to support an intentional infliction of emotional distress claim.") (citations omitted). Parker alleges Rainer subjected him to unspecified racial discrimination and that his supervisors treated him "differently and worse" after he complained. (Sec. Am. Compl. at ¶ 26.) He also claims he was terminated based on his race and in retaliation for his complaints, and that as a result

13

of Cenlar's conduct, he is generally suffering emotional distress, extreme harm, loss of professional opportunities and other harms. (*Id.* at ¶¶ 26, 29–30.)

Parker's alleged treatment was no more severe than allegations in other cases in this district in which IIED claims have been dismissed. *See, e.g.*, *Watkins v. Pa. Bd. of Prob. & Parole*, No. 02-cv-2881, 2002 WL 32182088, at *8 (E.D. Pa. Nov. 25, 2002) (dismissing IIED claim where plaintiff alleged pattern of racial discrimination in workplace and termination based on race because the "harassment alleged [did] not satisfy the element of extreme and outrageous conduct required to state this cause of action"); *Juisti v. City of Chester*, No. 18-cv-2317, 2018 WL 5249930, at *8 (E.D. Pa. Oct. 22, 2018) (dismissing IIED claim where plaintiff "was ridiculed, disciplined without merit, and denied favorable shifts to the point that he resigned his employment"); *Coney v. Pepsi Cola Bottling Co.*, No. 97-cv-2419, 1997 WL 299434, at *1 (E.D. Pa. May 29, 1997) ("[H]ighly provocative racial slurs and other discriminatory incidents do not amount to actionable outrageous conduct.").

Racial discrimination should certainly never be part of a workplace environment, but, as alleged here, it does not rise to the level of "the most clearly desperate and ultra extreme conduct" required to support an IIED claim under Pennsylvania law. *Hoy v. Angelone*, 720 A.2d 745, 754 (Pa. 1998). Furthermore, Parker's bald, conclusory legal allegations that he suffered generic harms, like "mental anguish," are insufficient to state a plausible claim of IIED.

IV

A court should grant a plaintiff leave to amend a complaint "when justice so requires." Fed. R. Civ. P. 15(a)(2). The Third Circuit has instructed district courts to

"offer amendment—irrespective of whether it is requested—when dismissing a case for failure to state a claim unless doing so would be inequitable or futile." *Fletcher-Harlee Corp. v. Pote Concrete Contractors, Inc.*, 482 F.3d 247, 251 (3d Cir. 2007). After Cenlar moved to dismiss, Parker amended his initial complaint under Rule 15(a)(1)(B). *See* (Am. Compl., ECF No. 7). Then, after Cenlar's Motion to Dismiss the Amended Complaint, Parker's Response and Cenlar's Reply, Parker sought leave to file a Second Amended Complaint. *See* (Mot. for Leave to File a Sec. Am. Compl., ECF No. 18). The Court granted leave to amend. (ECF No. 24.) Still, Parker fails to state claims for relief for disability discrimination under the ADA and the PHRA, or IIED under Pennsylvania law. Because Parker has had three chances to plead these claims, one of which came after full briefing on a motion to dismiss, the Court dismisses them with prejudice.

An appropriate Order follows.

BY THE COURT:

*/s/ Gerald J. Pappert*
GERALD J. PAPPERT, J.